UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROGER LANGE,

        Plaintiff,

                                File No. 1:14-CV-601

v.

                                HON. ROBERT HOLMES BELL

CITY OF BENTON HARBOR, DAN
McGINNIS, and TONY SAUNDERS,
individually and in their official capacities,

        Defendants.

_____/

**O P I N I O N**

This matter is before the Court on Defendants City of Benton Harbor, Dan McGinnis, and Tony Saunders' motion for summary judgment on Plaintiff Roger Lange's claims. (ECF No. 42.) Plaintiff brought suit against the City and individual Defendants for violations of Michigan's Whistleblower Protection Act, the Elliott-Larsen Civil Rights Act, claim and delivery, and violation of the Fourth Amendment of the United States Constitution. For the reasons that follow, Defendants' motion will be granted in part and denied in part.

**I.**

Plaintiff Roger Lange was hired as the Chief of Police for the City of Benton Harbor Police Department in October 2009. (Lange Resume, ECF No. 56-1.) In 2011, the Benton Harbor Police Department and Fire Departments merged into the Department of Public Safety. Lange was made the Director of Public Safety. (*Id.*) Lange's administrators included Robert O'Brien, a Deputy Director in the new Department with thirty years of law enforcement experience (O'Brien Resume, ECF No. 56-3), Dan Unruh, a Captain with over thirty years of law enforcement experience (Unruh

Resume, ECF No. 56-4), and Dan McGinnis.

In 2010, the State of Michigan determined that a financial emergency existed in Benton Harbor. The Local Emergency Financial Assistance Loan Board appointed Tony Saunders as the financial Emergency Manager in January 2013. (Saunders Dep. at 36, ECF No. 56-6.) Shortly prior to assuming his duties as Emergency Manager, Saunders and McGinnis contacted one another through their fraternity email accounts and met up at a restaurant.  (McGinnis Dep. at 38-39, ECF No. 56-8.) McGinnis did not notify Director Lange of his meeting with Saunders. (*Id*. at 42.)

Lange, McGinnis, and Saunders are African-American; O'Brien and Unruh are white. Saunders and McGinnis had been members of the same historically black fraternity chapter at the University of Michigan. (Saunders Dep. at 54; McGinnis Dep. at 16.)

In March 2013, Saunders arranged to meet with O'Brien for lunch, during which Saunders discussed O'Brien's career trajectory with the City of Benton Harbor. (Saunders Dep. at 14.) O'Brien testified that, during the conversation, Saunders told him that he could not be Chief of Police because O'Brien is white. (O'Brien Dep. at 90, ECF No. 56-10.) Furthermore, Saunders said  that McGinnis was his "brother" and "untouchable," and Saunders implied that he would replace Lange with McGinnis as the next Chief. (*Id.* at 90-92.)

The same day, Saunders had another meeting with Lange, Unruh, and Assistant City Manager Debbie Popp. (Unruh Dep. at 57-58, ECF No. 56-11; Lange Dep. at 116.) Saunders discussed that Lange was near retirement, and Saunders felt that McGinnis would be prepared to be chief in five or ten more years. (Unruh Dep. at 59-60.) Saunders told Unruh that Unruh could not be chief because he was the wrong color. (*Id*.; Lange Dep. at 117-18.) Saunders again expressed that McGinnis was his "brother," and he was "untouchable." (Unruh Dep. at 59-60.)

By late May 2013, Saunders had terminated the employment of thirteen administrative employees, including O'Brien and Unruh. (Saunders Dep. at 148-52.) Saunders had promoted McGinnis to Captain of the Police Division and provided him a salary increase. (*Id*. at 168.) Lange was aware that Saunders had made remarks about O'Brien and Unruh's limited career potential due to them being "the wrong color," and he suspected that Saunders terminated them for racially motivated reasons. Lange sent a memorandum outlining Saunders' conduct to the Deputy State Treasurer and Governor on June 17, 2013. (June 17, 2013, Memo from Lange, ECF No. 56-21.)

The Treasury Department received the letter by certified mail on June 24, 2013. (*Id*.) Lange had a regularly scheduled meeting with Saunders and McGinnis the following day, when Lange provided Saunders with a copy of the letter. (Lange Dep. at 217-18; Saunders Dep. at 179.) After he read the letter, Saunders dismissed Lange and McGinnis from his office and slammed the door after them. (McGinnis Dep. at 81-84; Lange Dep. at 222.) Fifteen minutes later, Saunders asked Lange to return to his office. (Lange Dep. at 223-25.) Saunders began discussing Lange's salary, despite that salary had not been on the agenda for the regularly scheduled meeting that day. (*Id*. at 220-223.) On July 8, 2013, Saunders cut Lange's pay from $118,000 to $88,500. (Saunders Dep. at 190; Lange Employment Status Change, ECF No. 56-23.) Several weeks later, on July 22, Saunders increased McGinnis' pay from $65,232 to $72,000. (McGinnis Employment Status Change, ECF No. 56-24.)

The Department of Public Safety had come under scrutiny at a July 1, 2013, City Commission Meeting because of the Department's failure to comply with Michigan Occupational Safety & Health Administration ("MIOSHA") regulations during a March 2013 fire when a firefighter nearly died. (City Commission Meeting Minutes, ECF No. 43-11.) An anonymous fax transmission was sent to the City Commissioners on July 18, complaining that Lange was not trained

as a firefighter. (July 18, 2013, Fax, ECF No. 43-12; Lange Dep. at 177-78.) Saunders sought the advice of counsel after reviewing the fax, who advised that Lange should train and pass the firefighter certification test. (Email from Scott Eldridge on July 19, 2013, to Saunders, ECF No. 43-14.) On July 19, 2013, Saunders called a meeting with Lange to notify Lange that he was relieved of his duties as Director of Public Safety and placed on administrative leave with pay until he passed firefighter examinations in August. (HR Meeting Notes of July 19, 2013, ECF No. 43-17.)[1]

Lange went on administrative leave and turned in his office keys, vehicle keys, and firearm. (HR Meeting Notes of July 19, 2013.) Lange was only permitted on City property to the extent necessary to prepare for his August 31 firefighter examination. (Email from Eldridge to Saunders on July 22, 2013, ECF No. 43-15.) Lange passed the written portion, but not the practical portion, of the certification exams. (Letter from Watson to Lange on Sept. 12, 2013, ECF No. 43-19.)

The City recalled Lange from administrative leave and assigned him to the position of Community Liaison Officer. (*Id*.) Lange declined the position and requested to be reinstated to his former position as Director of Public Safety. (Letter from Saunders to Lange on Sept. 19, 2013, ECF No. 43-20.) Saunders refused Lange's request, and offered him the options to accept the Community Liaison Officer position, begin an absence of unpaid leave to take the firefighting exams, or resign. (*Id*.) Lange began a period of unpaid leave on October 7, 2013. (Letter from Saunders to Lange on Oct. 8, 2013, ECF No. 43-23.)

Lange had stored various personal items in his office while he was Director, including lamps,

---

[1] Lange had previously intended to be cross-trained as a firefighter. He did not complete the six-month training program because he decided to stagger the training of the management team so that a management member would always be available for police duties. (O'Brien Dep. at 21; June 17, 2013, Memo from Lange, ECF No. 56-21.)

4

coffee makers, and a personal hard drive. Prior to returning the hard drive to Lange, McGinnis erased all files on the hard drive, including personal and work-related files. Not all of Lange's items have been returned to him. (Lange Affidavit ¶¶ 2-4.)

Saunders' term as Emergency Manager ended on March 10, 2014. (Saunders Dep. at 47.) Lange passed the certification exam in April 2014. The new City Manager Darwin Watson has not reinstated Lange as Director of Public Safety.

Plaintiff filed a four count Third Amended Complaint: Count 1, Violation of the Michigan Whistleblower Protection Act ("WPA"), Michigan Compiled Laws § 15.363; Count 2, Violation of the Elliott-Larsen Civil Rights Act ("ELCRA"), Michigan Compiled Laws § 37.2701; Count 3, Claim and Delivery; and Count 4, Violation of the Fourth Amendment to the United States Constitution. Plaintiff initiated this action in the Berrien County Circuit Court, and Defendants removed it to federal court on June 4, 2014. Defendants move for summary judgment on all counts.

## II.

The Federal Rules of Civil Procedure require the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In reviewing a motion for summary judgment this Court cannot weigh the evidence, make credibility determinations, or resolve material factual disputes. *Alman v. Reed*, 703 F.3d 887, 895 (6th Cir. 2013); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986) (stating that on a motion for summary judgment "[c]redibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge"). "[T]he district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Martin v. Cincinnati Gas and Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009) (citing *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007)). Nevertheless, the mere existence of a scintilla of evidence in support of a non-movant's position is not sufficient to create a genuine issue of material fact. *Liberty Lobby,* 477 U.S. at 252. The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*; *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

### III.

### A. Counts 1 & 2: Retaliation Claims under the Michigan Whistleblower Protection Act and Elliott-Larsen Civil Rights Act

Michigan's Whistleblower Protection Act ("WPA") provides protection to employees who report a suspected violation of state, local, or federal law. *Henry v. Laborers' Local 1191*, 848 N.W.2d 130, 144 (Mich. 2014). The Act provides,

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee . . . reports . . . verbally or in writing, a violation or a suspected violation of a law or regulation or rule . . . to a public body, unless the employee knows that the report is false[.]

Mich. Comp. Laws § 15.362. A plaintiff may prove a violation of the WPA using circumstantial evidence of retaliation "by showing that (1) the plaintiff was engaged in protected activity as defined by the act, (2) the defendant took an adverse employment action against the plaintiff, and (3) a causal connection exists between the protected activity and the adverse employment action." *Debano-Griffin v. Lake Cnty.*, 828 N.W.2d 634, 638 (Mich. 2013) (quotations omitted). The Court applies

the familiar burden-shifting framework set forth in *McDonnell Douglas*. *Id*. Once the plaintiff establishes a prima facie case, a presumption of retaliation arises. *Id*. The defendant may be entitled to summary judgment if it proffers legitimate reasons for taking the adverse employment action, and "plaintiff fails to show that a reasonable fact-finder could still conclude that the plaintiff's protected activity was a 'motivating factor' for the employer's adverse action" *Id*. (citing *Hazle v. Ford Motor Co.*, 628 N.W.2d 515 (Mich. 2001)). The plaintiff must raise a triable issue that the proffered reason was a pretext for unlawful retaliation. *Id*. at 639.

The Elliott-Larsen Civil Rights Act ("ELCRA") likewise provides protection from retaliation for a person who reports civil rights violations. ELCRA makes it unlawful for an employer to "[r]etaliate . . . against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." Mich. Comp. Laws §37.2701(a). The *McDonnell Douglas* burden shifting framework applies to ELCRA claims. *Mick v. Lake Orion Cmty. Schs.*, 706 N.W.2d 725, 725-26 (Mich. 2005). However, ELCRA requires a showing that the plaintiff's protected activity was a "significant factor" in the employer's adverse action, *Mickey v. Seidler Tool & Die Co.*, 516 F.3d 516, 527 (6th Cir. 2008), whereas WPA requires a showing that the plaintiff's activity was only a "motivating factor." *Delano-Griffin*, 828 N.W.2d at 639. To show that his activity was a significant factor, a "plaintiff must present evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Mickey*, 516 F.3d at 527-28 (citing *In re Rodriguez*, 487 F.3d 1001, 1011 (6th Cir. 2007) (citations omitted)).

Defendants assert that Plaintiff's claims of retaliation must be dismissed because (1) there is no causal connection between Plaintiff's alleged protected activity and his salary reduction (Defs.'

7

Br. at 13); (2) the mandate that Plaintiff complete firefighter certification does not constitute retaliation (*id*. at 14); and (3) Defendant Saunders has no influence on the decision not to reinstate Plaintiff as Director of Public Safety (*id*. at 15). There is no dispute that Plaintiff engaged in a protected activity when he sent the June 17 memo to the Governor and Deputy Treasurer alleging Saunders' inappropriate considerations of race in the termination of DPS employees.

Plaintiff has established a causal connection between his protected activity and his salary reduction. Plaintiff has presented evidence that Saunders broached the topic of Lange's salary less than twenty minutes after Saunders kicked Lange out of his office for bringing the complaint of Saunders' improper racial motives in terminating Unruh and O'Brien. Less than ten days later, Saunders cut Lange's pay by about 25%. The fact that Saunders was both the subject of Lange's complaint and the decisionmaker as to Lange's salary reinforces the connection. As the Michigan Supreme Court has pointed out,

> the fact that the same entity that made the decision to [take adverse action against the plaintiff], the board, was also the direct recipient of plaintiff's complaints strengthens the causal link between plaintiff's protected activity and defendants' adverse action because it is reasonable to infer that the more knowledge the employer has of the plaintiff's protected activity, the greater the possibility of an impermissible motivation. Similarly, it is reasonable to conclude that the more an employer is affected by the plaintiff's whistleblowing activity, the stronger the causal link becomes between the protected activity and the employer's adverse employment action.

*Debano-Griffin*, 828 N.W.2d at 639.

Defendants claim that the financial emergency facing Benton Harbor was a legitimate reason for lowering Lange's salary, unrelated to and decided prior in time to his whistleblowing activity. (Defs.' Br. at 13; Defs.' Reply Br. at 3, ECF No. 61.) But a jury could reasonably find that Defendants' facially legitimate economic reason was merely pretext. Plaintiff has demonstrated

more than mere temporal proximity between his June 17 whistleblowing activity and the June 30 decision to cut his salary. *See Debano-Griffin*, 828 N.W.2d at 639-40 (finding the plaintiff raised a genuine issue of material fact regarding causation under the WPA where, during a twelve-day period, the plaintiff made several complaints regarding inappropriate use of funds, and her position went from fully funded to non-existent). Plaintiff has presented evidence that places in question the validity and authenticity of Defendants' evidence that they had already decided to cut Plaintiff's salary by 25%. (Pl.'s Resp. Br. at 12-13.) Plaintiff testified that previous discussions regarding his pay considered only a 5% to 10% decrease. (Lange Dep. 125, 151-52.) Moreover, Plaintiff points to the salary increases for other personnel in the Department of Public Safety and his proposed cost-saving measures that undermine the credibility of Defendants' proffered reason for decreasing his salary. Plaintiff has raised questions of material fact regarding temporal proximity, Defendants' credibility, and Defendants' position that the salary cuts were economically necessary. Viewed in the light most favorable to Plaintiff, the facts support a reasonable inference that retaliation was a significant factor in Defendants' decision to reduce Plaintiff's salary.

The parties disagree whether the firefighter certification mandate constitutes adverse employment action. Defendants contend that the requirement that Lange be cross-trained as a firefighter was not an adverse employment action, but a statutory requirement. Saunders acted on the advice of legal counsel, who interpreted Michigan state law and MIOSHA regulations. Plaintiff has attacked the validity of the counsel's interpretation, and points out that Saunders did not likewise require other members of the Public Safety Department to be cross-trained and certified.

Even assuming that firefighter certification was required by statute, a reasonable jury could infer that Defendants took adverse action by setting Lange up to fail the certification. According to

Plaintiff's experts, it was "unreasonable" to expect that Plaintiff could prepare for the test from July 19 to August 31 because 227 hours are required for training. (Ruff Dep. at 31-33, 59-60, 72-73.) When Lange prepared for a later administration of the test, Defendant McGinnis sent a text message to a friend indicating his hope that Lange would fail. (Text Message, ECF No. 56-39.) Based on the facts that Defendants did not mandate cross-certification for other Public Safety officials, that Defendants did not provide Lange the usual six-months of formalized training, and that Saunders did not allow Lange to continue to perform only his police duties pursuant to counsel's advice, and the temporal proximity between Lange's whistleblowing activities and the decision to relieve him of his duties as Public Safety Director, a reasonable juror could infer that enforcement of the firefighter certification mandate was a pretext for retaliation.

Plaintiff claims that Defendant Saunders also retaliated by dismissing him from the Director position and offering him a demotion to Community Liaison Officer. (Pl.'s Br. at 19.) Saunders counters that the decision not to bring Plaintiff back as Director of Public Safety does not constitute retaliation because Saunders is no longer Emergency Manager, and thus lacks authority to make that decision. (Defs.' Br. at 14.) Saunders was not removed as Emergency Manager until March 2014, during which time he could have reinstated Plaintiff.

Viewed in the light most favorable to Plaintiff, the facts support a reasonable inference that retaliation was a significant factor in Defendants' decision to take adverse employment action against Plaintiff. Accordingly, Defendants' motion to dismiss Counts 1 and 2 will be denied.

**B. Count 4: Violation of the Fourth Amendment**

Plaintiff claims that McGinnis violated his Fourth Amendment rights by seizing his personal effects, including his hard drive, and that any reasonable official who intruded upon a hard drive,

10

knowing it contained personal information and having no suspicion it contained City documents, would know that he violated the Fourth Amendment. Defendants assert that Plaintiff had no reasonable expectation of privacy in the information stored on his external hard drive; the City cannot have municipal liability; and Defendant McGinnis is entitled to qualified immunity. The parties conflate "search" and "seizure" under the Fourth Amendment, but the outcome of the analysis does not change.

The Sixth Circuit has established a two-step inquiry to determine whether a warrantless search of a public employee's workplace violates the Fourth Amendment. First, the court determines whether the employee has a reasonable expectation of privacy in the workplace. *James v. Hampton*, 592 F. App'x 449, 454-55 (6th Cir. 2015) (citing *O'Connor v. Ortega*, 480 U.S. 709, 717-18 (1986) (plurality opinion)). Second, if the employee does have an expectation of privacy, the warrantless search must be reasonable at its inception and reasonable in scope. *Id.* (citing *O'Connor*, 480 U.S. at 725-26). "A search is justified at its inception 'when there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct, or that the search is necessary for a noninvestigatory work-related purpose such as to retrieve a needed file.'" *Id.* (quoting *O'Connor*, 480 U.S. at 726). "The search is reasonable in scope when it is 'reasonably related to the objectives of the search and not excessively intrusive in light of . . . the nature of the [misconduct].'" *Id.* (quoting *O'Connor*, 480 U.S. at 726 (alterations in original)).

### 1. Reasonable Expectation of Privacy

Apparently, Lange had connected his external hard drive to his work computer, and he saved several work-related files onto his hard drive among his other personal files on the drive. Defendants claim that Plaintiff did not have any expectation of privacy in the information stored on his hard

drive because the files were work-related. (Defs.' Br. at 18.) However, Defendants also erased Lange's personal files stored on the hard drive. Defendants conflate an expectation of privacy in the device itself with an expectation of privacy in the files stored on the device. *United States v. Lichtenberger*, --- F. 3d ---, 2015 WL 2386375, at *8 (6th Cir. May 20, 2015)(ruling that the file or data, rather than the entire physical device, is the proper unit by which to determine the scope of search). Under Defendants' position, they would have been entitled to destroy an entire paper filing cabinet and all its contents if several work-related files were in the cabinet. Yet a storage device can contain hundreds more files than a single filing cabinet, still increasing the risk of intrusion upon an individual's privacy. *See id.* ("Searches of physical spaces and the items they contain differ in significant ways from searches of complex electronic devices under the Fourth Amendment.").

"Public employees' expectations of privacy in their offices, desks, and file cabinets, like similar expectations of employees in the private sector, may be reduced by virtue of actual office practices and procedures, or by legitimate regulation." *O'Connor*, 480 U.S. at 717. Under the facts of *O'Connor*, the Supreme Court found a reasonable expectation of privacy with respect to a filing cabinet in the plaintiff's personal office which contained personal correspondence, medical files, financial records, and other personal items. *Id.* at 718. On the facts of this particular case, Lange had a reasonable expectation of privacy in the contents of his personal files on his computer. Only Lange had access to the hard drive, he routinely brought the hard drive home at the end of the work day, and he never shared the contents of the drive with other employees. The City and Department of Public Safety had no practice of routinely conducting searches of office work computers or storage devices used by employees. McGinnis knew that Lange stored personal files on his hard drive. Construing the evidence in favor of Lange, he had a reasonable expectation of privacy in the personal

folders stored on his personal external hard drive. *See, e.g., Leventhal v. Knapek*, 266 F.3d 64, 73-75 (2d Cir. 2001) (plaintiff had a reasonable expectation of privacy in his desk, filing cabinet, and computer where he had exclusive use of items and employer had no policy of routine searches); *United States v. Angevine*, 281 F.3d 1130, 1134-35 (10th Cir. 2002) (professor had no reasonable expectation of privacy in files downloaded from the internet on his work-issued computer where the university maintained a policy to randomly audit internet use on work-issued computers);

### 2. The Nature and Scope of the Search and Seizure

The scope of a search will be appropriate if "reasonably related to the objectives of the search and not excessively intrusive in light of the nature of the misconduct." *O'Connor*, 480 U.S. at 726 (alterations omitted). The seizure of work-related, City-owned files from the external hard drive was reasonably related to the City's objective to retrieve files. *Id.* (search is justified "for a noninvestigatory work-related purpose such as to retrieve a needed file"). Thus, the search was justified at its inception. However, Defendants audaciously claim that "[t]he search in this case was exceedingly minimal" where the full scope of the search and seizure included every file on the hard drive, which numbered in the thousands. (Defs.' Reply Br. at 9; McGinnis Dep. at 234-35.) McGinnis did not even attempt to segregate personal and work-related files so as to minimize the intrusion upon Lange. (McGinnis Dep. at 235.) Furthermore, Lange has testified that other City employees are aware of the contents of personal photos that were stored on his hard drive. (Lange Affidavit at ¶ 11-15.) Even considering that the hard drive contained work-related files, the facts support a reasonable inference that the search was unreasonable in its scope because it was excessively intrusive.

13

### 3.  Municipal Liability

Plaintiff seeks to hold the City liable for McGinnis' unconstitutional search and seizure of his personal external hard drive.  It is well established that a municipality cannot be held liable under a theory of respondeat superior.  *Monell v. Dept. of Soc. Servs*., 436 U.S. 658, 691 (1978).  A plaintiff must show that a municipality "through its deliberate conduct . . . was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). This requires a showing of a "direct causal link between the municipal action and the deprivation of federal rights." *Id.* Such a standard requires a plaintiff to identify "a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Id.* at 403 (citing *Monell*, 436 U.S. at 694; *Pembaur v. Cincinnati*, 475 U.S. 469, 480–81 (1986); *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."  *Id.*  at  403-04.  "[P]roof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably."  *Id.* at 405.

Plaintiff has not alleged that his rights were violated as the result of any written policy. Plaintiff suggests that a widespread custom or practice exists because McGinnis had impermissibly seized personal items from a personal vehicle of some Jimmie Knight in November 2014. Such an allegation is insufficient to demonstrate a custom or policy, even if accepted as true. The Court finds that Plaintiff's claim of municipal liability is based upon a mere "a legal conclusion couched as a factual allegation."  *See Twombly*, 550 U.S. at 555. Accordingly, the City's motion to dismiss the § 1983 claims asserted against it in Count 4 will be granted.

14

### 4. Qualified Immunity for McGinnis

Defendants assert that Defendant McGinnis is entitled to qualified immunity from Fourth Amendment claims of unreasonable search and seizure because he did not violate Lange's constitutional rights. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, __ U.S. __, 131 S. Ct. 2074, 2080 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once the defendants plead an affirmative defense of qualified immunity, the burden shifts to the plaintiff to "show that the official violated a right so clearly established 'that every reasonable official would have understood that what he [was] doing violate[d] that right.'" *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 636 (6th Cir. 2013) (quoting *al-Kidd*, 131 S.Ct. at 2038).

McGinnis' assertion of qualified immunity fails. The right at issue here is Lange's right from intrusion upon the contents of personal files located on a personal hard drive connected to a work-computer in the public employment context. The facts of *O'Connor* clearly establish that Lange had some expectation of privacy in his files at work. *See also James*, 592 F. App'x at 455-56 (citing additional cases). Yet McGinnis made no attempt at all to ensure that his search was reasonable in scope. There simply was no scope to McGinnis' search--he deleted the entire hard drive. (McGinnis Dep. at 235 ("[T]he easiest way to knock those [City files] out is to wipe the whole thing.") Every reasonable official would have understood that erasing an employee's entire personal storage device merely to search a limited number of files would violate an employee's right to privacy.

Accordingly, the Court will grant summary judgment to the City on Plaintiff's Fourth Amendment Claim and will deny summary judgment to McGinnis and also to Saunders, who has

not asserted a personal defense to this claim.

**C. Claim and Delivery Claims**

Defendants assert that Plaintiff's claim and delivery action must be denied because all items of personal property have been returned to Plaintiff, except the security systems and cameras which belong to the police department. (Defs.' Br. at 23-24.) Plaintiff claims that his personal i-Pad and criminal law and procedure books have not been returned. (Lange Dep. at 68-70.) There are questions of material fact whether the City still maintains any possession or control over the items. (Defs.' Reply at 12-13.) Accordingly, summary judgment is inappropriate.

**IV.**

Plaintiff Lange has established genuine issues of material fact as to all his claims, except for his Fourth Amendment claim. The City is immune from liability for violations of the Fourth Amendment. For the reasons stated above, the Court will grant in part and deny in part Defendant's motion for summary judgment.

The Court will issue an Order consistent with this Opinion.


Dated: May 27, 2015               /s/ Robert Holmes Bell
                                      ROBERT HOLMES BELL
                                      UNITED STATES DISTRICT JUDGE